Good morning. May it please the court, my name is Rebecca Smith and I represent the appellant Anthony Patrick Reed in this case and I would like to reserve three minutes for rebuttal. This case is at its core about the intersection between the cardinal First Amendment right to observe and document government conduct in a public place and the intersection of that right with the Fourth Amendment right to be free from unreasonable seizure when engaging in protected First Amendment conduct. I don't get it. I mean what, you know, this was an area where he went, your client was asked to go away, I mean to remove himself because of safety concerns and let's see what the issue is. Well, Your Honor. You can't stand in the middle of traffic, of a traffic circle and say I'm entitled to observe so I'm going to stand in the middle of the freeway, right? That's correct, Your Honor, and that would be an actual safety threat but in this case we only had a speculative safety threat and as you stated in your concurrence in Norse v. Santa Cruz. Who are we to judge that? I mean they, it's not like they picked on your client. It's not like Norse where they kicked him out for giving the Zieg Heil. They, you know, your client along with everybody else was told, you know, no cars on this stretch of freeway because there's a bunch of buffalo going to go through. Was it buffalo, bear, you know, some wild animals, right? No, Your Honor. He was not actually on the highway and so that is a key distinction. He was within the zone marked for the crossing, right? No, Your Honor. The zone for the crossing, the actual route for the operation was the Madison Arm Road crossing Highway 191 and then heading further east on that location and so the issue for the jury here is, is a buffer zone of over half a mile away from the operations route reasonable and that is an issue for a jury to decide. Really? Yes. You mean do they also get to guess whether or not the freeway should be four lanes as opposed to three lanes and, you know, somebody's entitled to be in the, you know, center lane, you know, taking pictures because you really don't need four lanes of freeway traffic? She just strikes me as totally absurd. Was anybody, were they picking on a client? Did they let other people stay there and say, oh, you guys can stay there and take pictures except we're going to pick a, was there anything like that going on? Your Honor, at the time no one else was attempting to take pictures but what we do know from the record in Exhibit 12 is that later on the same day, several hours later, law enforcement did allow tourists in Yellowstone Park to stand within 50 yards of the same Buffalo operation. So why were tourists allowed to stand within 50 yards while Mr. Reed was ordered to keep a distance of 0.9 miles away? That's over a thousand yards away because of his association. Wasn't the area where Mr. Reed was standing where he parked his car on higher ground as well where it was unlikely that the Buffalo would go to the rim as opposed to just cross at the lowest point? Absolutely, Your Honor. There is absolutely no evidence that the operation was going to head toward Mr. Reed's location at any time. We know, in fact, that the route across Madison Arm Road, across the highway to Conservation Lane, that was the actual route that the operation took. So if he had stayed in that location, the operation would have passed without any problem over half a mile to the south of Madison. With respect to the, I'll call it the buffer zone, I don't know how to pronounce Douglas, is it Lawrence? Lawrence. He asks, and then tickets him because he won't move, asks Mr. Reed to move north by another three-tenths of a mile. And what's the point of that three-tenths of a mile? Is that where he is asking him to move? The traffic is still going through. That's correct. At some point they're going to make the traffic stop so that the Buffalo can come across. That's correct, Your Honor. But is that the point at which it stops the traffic on the main highway? What's the point of 0.9 miles away from where the Buffalo were likely to cross? Your Honor, there is no point. There is no difference in terms of safety between the six-tenths of a mile buffer zone that Reed chose. Okay, let me ask the question in a different way. Do you know at what point, how far away from where the Buffalo came across, that the moving traffic, the traffic that would have been just driving along the road, do you know at what point they were stopped coming in from the north? Yes, Your Honor. So after Deputy Lawrence took Mr. Reed to that location, 0.9 miles away, he then waited a little while, then he did eventually stop traffic at that There were curves right after that in the road, which they needed to have cars slow down, right? Your Honor, I don't believe there's any change in the speed limit at that curve, but what the curve did affect . . . It blocked the view of drivers coming into the valley there, correct? Yes, and it blocked Mr. Reed's view of the operation. So he was essentially completely excluded from viewing the operation. And as to your question, Judge Fletcher, I'm not sure of the exact distance from the south side of the operation, but we do know that the nine-tenths of a mile was where Deputy Lawrence eventually did block highway traffic. But your basic argument, both at trial and here, is that requiring a parked car to move is different from stopping traffic, which may have different criteria as to when you're going to stop the moving traffic or where on the road it's a safe place to do that. Absolutely. And that what happened to Mr. Reed is really he's being targeted because these guys don't like his organization. That's your argument. Absolutely. And to sort of add further insult to injury . . . Are there other places where he could have gone to take pictures of the view? I mean, other people did. No, Your Honor. Not the highway crossing, no. Absolutely not. The location where he was forced to go .9 miles or .9 mile, he could not view the operation. If he would have driven south, there was a rise and a fall on the road there. He also could not have viewed the operation from the south. And we know because there was individuals following . . . So the other people had videos of the crossing? No one has a video of the highway crossing. They do not. They have video of the Buffalo, right? They have video of the Buffalo at other times of day. There is no record that day of an accurate count of all of the Buffalo that were involved, all the government agents that were involved, and whether any wildlife was pushed out ahead of the operation. That was the whole point of driving that .6 of a mile, parking up on a . . . I want to reiterate, this was an open public Forest Service road that Mr. Reed parked on that was separate from the highway. So he picked this empty, open Forest Service road to park on to turn around and watch. And that would have been the only spot that entire day where they could have documented an accurate count of the agents that were involved. And for Mr. Reed's . . . Were any other vehicles allowed to stay there? No other vehicles were on that Forest Service road attempting to observe the operation. But we do know later in the day, law enforcement officers did allow tourists to film the operation from within 50 yards. And that is why we say that Mr. Reed's buffer zone that he chose, which was six-tenths of a mile over a thousand yards, a jury could definitely find that that was reasonable when law enforcement officers later in the day only enforced a 50-yard buffer zone. And the National Park Service's own regulations only require a 25-yard buffer zone for safety from Buffalo. And so I guess that would be sort of . . . I have to say, I've been in Yellowstone Park. I've come out of the hotel and there are a couple of them standing around in the parking lot . . . Absolutely. Yes, Your Honor. Now they're not moving around and being driven, but they're standing around just kind of looking at me as I open my trunk. Absolutely, Your Honor. These Yellowstone Buffalo are completely acclimated to people. They're completely acclimated to parked cars. I won't quite say that . . . in fact, I have to say I was a little bit nervous because the Park Service keeps warning me, listen, these are wild animals. And so when I walk out of the parking lot and have to say hello to them as I get into my car, I don't like it. Well, and that's why the Park Service says keep a distance of 25 yards. No, a parking lot is different from having a drive where they're moving and they're being pushed by the ones behind them and they're being driven. It's quite a different operation. Yes, Your Honor. And if we look at the video, we see that even during the drive, even during the operation where we're pushing them, the law enforcement officers later in the same day allowed people to still stand within 50 yards and that was a safe distance. So we have evidence that day that different law enforcement officers enforced a reasonable buffer zone of 50 yards. We have the Park Service's own regulations that only require a 25-yard buffer zone. And then we have the way the law enforcement officers treated this political activist, which was to require a buffer zone of over 1,500 yards. And I want to emphasize that at the time he was arrested, this campaign had provided eyewitness evidence which had resulted in an injunction from a federal court against the use of helicopters in these operations. And so absolutely, Mr. Reed did believe that he was the low-hanging fruit at this time because he had provided, his organization had helped to provide evidence that had been used to grant an injunction against the same operation. And that injunction was, in fact, in effect at the time that he was arrested. But no helicopters were being used in this particular operation? On this day, correct, because of the injunction. There's a say that the defendants and everybody else involved in the hazing, they were, as far as I can tell, scrupulously obeying any injunction out against them. Correct. Correct. But that does separate out Mr. Reed from every other member of the public because he was associated with this political organization that we could say was not in favor by the defendants at this time. But on the Fourth Amendment claim, Mr. Laurance, if that's how you pronounce it, was told by the supervisor he had to clear everybody out of there up to that point where he instituted the roadblock. And so, isn't it relevant what he believed at the time? That he was supposed to get everyone out of there even though a car wasn't on the road, it was on a side road like Mr. Reed did? No, Your Honor, because under the Montana Supreme Court's decision in Kalispell v. Cameron, when you look at the Montana Obstruction Statute, the inquiry is not about the officer. It's about whether that individual was in circumstances that... But the inquiry is about the officer when you're talking about whether they have immunity, right? For 1983 purposes? Qualified immunity. So that would ask whether this was a clearly established right. And the city of Kalispell v. Cameron was clearly established a lot this time. And it did clearly establish that you have to show that the individual is aware that it is highly probable that they will actually obstruct something. And that's why the key fact in this case is that Mr. Reed never blocked the operation. There's absolutely no evidence that he physically blocked the operation. Well, he doesn't have to physically block it. If he does something to impede the operation, that would constitute obstruction. And we do know that Officer LaRance, in the process of the ticketing, he called somebody to stop the hazing. Correct. So it stopped. Now, whether it was stopped because of the action of Mr. Reed, or whether it was stopped because Mr. LaRance wanted to set up a record so that he could have a good ticket, I don't know. But we do know that it was stopped when LaRance makes a call to say, hey, stop, because I'm writing a ticket to this guy who's 0.6 miles above the expected crossing point. Which begs the question, what if Deputy LaRance had not stopped and cited Mr. Reed? The answer to that is that the operation would have went on and never been impeded at all. So it was actually Deputy LaRance's choice to stop the operation. But safety officers do stuff like that all the time. They stop traffic. They clear buildings. They clear airports. And with a benefit of hindsight, you say, oh, well, you know, that was not a credible bomb threat. There was no reason to do it. But they do lots of stuff like that. And I'm not aware that we can second guess that. Is your proper defendant really Tierney here? Because it's Tierney who has the initial encounter with him when he's right down at the road where the crossing is going to take place. And apparently that was quite a it was a brief but quite a heated exchange. And it's Tierney who says you either go north or go south. I think it is disputed as to precisely what Tierney meant when he said go north. Tierney and LaRance seem to think that that means go above the blockade where LaRance is going to stop at point nine miles away. Reid says, no, just go north. There's a dispute as to what he said. But if we've got somebody who is responsible for LaRance, it sounds as though it's Tierney. So why are you suing Tierney? Well, Your Honor, he did not issue the actual citation. But it turns out that LaRance, as the evidence is developing, is LaRance is responding to what Tierney tells him to do. And so LaRance is the trained officer. It was his obligation as the trained law enforcement officer to know that just because a member of the public does not explicitly comply with a police order, does not necessarily constitute the crime of obstruction. Could I reserve my remaining time for rebuttal? Thank you. OK. We'll hear from opposing counsel. Morning, Your Honor. I'm Steve Milch. I represent the defendants in the case. And my hearing aids just chose a time to die on me here. So if you could speak up, I'd appreciate it. Where do I start? They appealed everything. With respect to the Fourth Amendment, Mr. Reed was told three times that he could not park his vehicle in the safety corridor that they were trying to establish over a busy U.S. highway, 191. He was told that he could locate his vehicle on either the northern or southern ends of the highway behind the blockading law enforcement vehicles. Well, that's not what he says he was told. He says he was just told to move north. He does not say, or I think he says he was not told to go outside the safety corridor, if that's the right word for it, north of where LaRance was. So you've got a dispute in the evidence as to what he was told. I probably missed most of your question there, Mr. Fletcher. I've got hearing difficulties, too, so I'm sympathetic. I think there is a conflict in the evidence. As I read the evidence that came out in trial, Reed says, I was told to go north or go south. I went north, and I went .6 miles north. I was not told specifically that I had to go north of Officer LaRance. LaRance and Tierney say he was told, well, it would have been Tierney who said it, Tierney says, I told him to go north of LaRance. So we've got a conflict of the evidence. So that means that you can't rely for purposes of a judgment as a matter of law on what Tierney says he says. Your Honor, there is no conflict in the evidence. He was told to go to the north or the south behind the blockading law enforcement. So where do you get the behind the blockading law enforcement? You get that from Tierney. Reed does not agree with that. Reed says, I was just told to go north. He agreed at trial, Your Honor, that he could either go to the north end or the south end of the highway. I don't know about end. So tell me where he agreed at trial. Where in the transcript does Reed say that? Well, he was not to go to where he went, let's put it that way. Well, no, you told me that at trial, Reed testifies that he was told to go north of LaRance. At least that's what I think you told me. So where in the transcript does he say that? Because I read the transcript and I didn't see it. Your Honor, the DOL agent, Tierney, is the one that talked to Mr. Reed and told him to move out of the way. He radioed, Tierney radioed Deputy LaRance and said, the guy is coming up your way. Deputy LaRance was up at the north end of the highway getting ready to blockade it, and it blockaded it. And he radioed Deputy LaRance and said, he's on his way up. Well, he never came, okay. LaRance was waiting for him, and they figured, well, geez, he parked halfway between them. And that's what occurred. Now, I asked you a question, and you've so far not answered me. I asked you, where in the transcript does Reed say this? Because as I read the transcript, Reed says, he just told me to go north. Reed does not say, he told me to go north of LaRance. Well, I think it's, we're quibbling about exactly what he said, but I, you know, he was supposed, he wasn't supposed to park where he went. Well, that's what Tierney says, and Tierney may well be right. Right. But I don't, but Reed seems to say something else. Well, annoyingly, you know, if we were talking about the Fourth Amendment claim, the fact that, you know, he was parked in an area with no drive zone. I mean, they had to stop the Hays because of, you know, his location of the vehicle. That stopping of the Hays was what constituted the crime of misdemeanor of obstruction. But the no drive zone was pushed back because of curves in the road and cars coming through there at high speed. And is there any evidence in the record that would demonstrate that Mr. Reed could obstruct the Hays in any way from the point at which he was parked? How could he obstruct it in any way from that point? Because, Your Honor, they had created this no drive, this safety corridor is what I call it. It was 0.9 miles wide. It's going to be sufficiently wide to accommodate the unpredictability of where these wild bison are going to cross the road. OK. Did they get more predictable further down when the tourists get to be on foot and only 50 feet away, 50 yards away? I'm sorry. This is I apologize. There was a sarcastic question. You talked about the unpredictability of these wild animals. Well, the unpredictability of the wild animals is not such that they had to keep the tourists very far away further down the road. Later on in the day, the tourists are allowed to be on foot. That is to say, not even on the ability to run away in a car 50 feet away from these wild animals. So 0.6 miles away uphill in a car with the ability to drive away. I don't see that the safety of Mr. Reed is really a significant issue. Unless you're endangering the public further down the road. They don't know where the bison are actually going to cross. And obstruction of a vehicle in there could turn them around. And it was a safety matter is what it was. Of course, that's what you say. And the problem is that there's another way of looking at it, which is to say that he was targeted because he was part of a group that had successfully obtained by video and other means an injunction against them with respect to the helicopters. And Officer Lawrence is very well aware of this. He writes up his report specifically mentioning disruptions caused by this group. So he knows exactly who this guy is. And the argument is that the safety concern is a smokescreen. Can you say as a matter of law that there is no there's no substance to the argument that this was a smokescreen for preventing them from exercising their First Amendment rights? Because we're at the matter of law. This is basically summary judgment after we've had some testimony. Your Honor, I apologize. I'm just not picking up. I used to clerk for Judge J. Blaine Anderson and Steve Trott. And your mom, Betty Fletcher, had a voice, too, that I just couldn't pick up at all. I apologize. Well, this is not your fault. Let me try again. This is basically summary judgment. I mean, judgment is a matter of law at the end of plaintiff's evidence. So we have to take all of the evidence in favor of the plaintiffs. If there's something disputed, we have to let it go with them and say it should have gone further to trial. Are you OK so far in terms of hearing? Yeah. Yeah. Reasonable inferences in favor of the non-movement party. Right. And the argument that the other side is making is that their evidence is sufficient to show, if believed, that the safety concerns were a sham and that Mr. Reed was targeted because he was a member of a group that had succeeded in altering the way these hazes were conducted. And it seems to me that there is some evidence to support that. How do you respond? Your Honor, I don't think it's a reasonable inference in favor of Reed. And I'm still missing a lot of what you said. But he was an obstruction in this no-drive zone. They had to stop the haze in order to get him out. Now, you know, I was ready to argue to the jury if I ever went to the jury, was that if Mr. Reed had parked where he did and then got run over by one of these bison, you know, we'd be back in a lawsuit anyway, and he'd be suing deputy of the ranch for the basis that, hey, you should have gotten me out of harm's way. You know, so you're damned if you do and you're damned if you don't. What about the tourists? Pardon me? What about the tourists? The what? Tourists. Tourists. The, you know, everybody was, you know, prevented from going into this no-drive zone, Your Honor. You know, in the video that we've introduced, it was Defendant's Exhibit 12, which was submitted to the Ninth Circuit here, you could see some tourists that are looking at the, you know, watching the haze as it crosses the river and stuff like that. You know, that has nothing to do, that was way beyond where the highway was. The danger in this whole case was having to cross, you know, have these bison cross a busy U.S. highway, and that's the reason for this .9-mile corridor that they created. And the evidence at trial, too, you know, shows that these bison didn't all, they were scattered, you know, approximately a half-mile as they were running over the road, okay? Could have ran over, you know, Reed where he was, you know, parked his vehicle. So I'd like to, you know, just real briefly address, if I could, the First Amendment argument that they had. And, you know, my position is that, you know, when Reed parked his vehicle within the safety corridor, which was being established over 191, he was not engaged in any expressive conduct protected by the First Amendment. Rather, he was simply defying lawful instructions that, for safety purposes, as you pointed out, that he not locate his vehicle in that particular area. Now, there was a Ninth Circuit decision, Young v. City of Los Angeles, 2011, decision which the plaintiff was arrested for refusing to comply with the law enforcement officer's orders, requesting that he reenter his vehicle during a traffic stop. The plaintiff challenged his arrest on the grounds of his repeated statements of refusing to comply with those orders constituted acts of expression, and his arrest was therefore violated. One just quick question there. Isn't it clear from the record and clear from the entire case that Mr. Reed was intending to engage in expressive activity, the activity of watching to make sure that this haze is done appropriately? Isn't that protected by the First Amendment? Well, that's what he was saying. In Fordyce v. City of Seattle, Judge Trott recognized, without any elaboration, that there's a First Amendment right to film matters of public interest. We didn't prevent Mr. Reed from, you know, videotaping this haze. Oh, yes, you did. You moved him so he couldn't see it. Well, the evidence at trial, Judge Fletcher, is that if he had gone to the south end of that highway behind UOL Agent Turney, he could have videotaped him as he ran across the road. His testimony was, if I had gone south, I would not have been able to observe. Now, that may or may not be true, but that's his testimony. Well, it's undisputed that he could have if he chose to go south rather than north. No, it is disputed. In any event, as far as the First Amendment right, you know, assuming that, you know, this First Amendment right that Judge Trott brought up in Fordyce was somehow implicated by restricting where Mr. Reed could locate his vehicle, the government can impose reasonable time, place, and manner restrictions. And, you know, for the reasons stated in my brief, those restrictions were... But they have to be narrowly tailored, correct? They have to be narrowly tailored. The restrictions have to be narrowly tailored, correct? Correct. And they were. I mean, it was a .9-mile no-drive zone. It's to protect the traveling public, okay? I mean, you know, they are wild animals. Yes, but he was not driving and he was not traveling. Well, he was blocked. I mean, he was in an area where the Buffalo were going to cross, okay? And they can turn on, you know, they're not, I think one of the deputies or, I'm sorry, a DOL agent described these hazing activities as trying to herd cats. I mean, they turn around and... Yeah, I know that. I saw that. I see my time's up. Thank you. Okay. I think you have a little time left for rebuttal. 37 seconds. I'd like to just start by addressing Mr. Milch's representation that the tourists that you asked about, Judge Kaczynski, were way beyond the highway. And I would point the Court to the testimony in the record at ER 66 to 67. Highway 191 is the highway that those tourists are standing on the shoulder of. So it's actually the exact same highway. Highway 191 actually makes sort of a 90-degree turn and then goes into the park. So it's the same highway they're standing on and the same river and the same buffalo and the same herding operation there. Regarding the herding cats comment, what Agent Tierney actually testified in ER 112 was... You know, the ERs here are organized by tabs, not by... Your Honor, appellants' ERs have page numbers and the appellee's ERs have tabs. So that would be the appellant's ER at 66 to 67. And then the appellant's ER at ER 112 was Agent Tierney's testimony, quote, that was a pretty simple day. So actually it was a pretty simple herding operation. And I see that I'm out of town, out of time. Out of town and out of time. Well, so they were docile cats on that day. They were herdable cats, more like cows, more like buffalo on that day. On that day. Yes. But, you know, so other days are different. Right. And so we have to look at whether there was an actual threat on this day, not a speculative threat for the purposes of the First Amendment. And unless there's any further questions, I do see I'm out of time. Thank you. Okay. The case is signed. We'll stand for a minute.
judges: Kozinski, W. Fletcher, Tunheim